

# NUMBER 13-22-00304-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF M.R. AND X.R., CHILDREN

On appeal from the County Court at Law
of Aransas County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Silva**
**Memorandum Opinion by Justice Silva**

Appellant Evelyn appeals the trial court's order terminating the parent-child relationship between her and her two children, Matthew and Xander.[1] By two issues, Evelyn argues that the trial court erred because there was legally and factually insufficient evidence to support (1) the enumerated grounds for termination, and (2) a finding that termination was in the children's best interest. We reverse and remand for further

---

[1] We refer to the parties and children by aliases in accordance with the rules of appellate procedure. *See* TEX. R. APP. P. 9.8(b)(2).

proceedings.

## I. BACKGROUND

Matthew and Xander were originally removed from Evelyn's care on March 26, 2018, when Matthew and Xander were eight and four years old, respectively. By the time of trial, Matthew was twelve and Xander was eight. According to Texas Department of Family and Protective Services (the Department) caseworker Julia Escamilla, the Department removed the children after it received a report that Matthew made an outcry that his mother had hit him, and he was expressing suicidal ideations. Escamilla testified that medical staff noted he had bruising although she herself never saw it.

At one point, the children were placed back with Evelyn on a "return and monitor" basis; however, the placement subsequently failed. Escamilla agreed that the return failed because Matthew made an "outcry about hitting" but she did not otherwise elaborate. Following the failed return and monitor, the trial court entered an agreed order appointing the Department as the permanent managing conservator of the children. The trial court thereafter ordered the children to be placed with their father, Ruben.[2] The placement with Ruben also failed because he "assault[ed] his pregnant girlfriend in front of the children," for which he was placed on deferred adjudication community supervision. After the placements, the Department filed a new petition to terminate the parent-child relationship between each parent and child.

Only two witnesses testified at trial: Escamilla and Evelyn. The only exhibit entered

---

[2] The trial court also terminated Ruben's parental rights to Matthew and Xander. Ruben is not a party to this appeal.

2

was Ruben's order for deferred adjudication. Escamilla testified that Evelyn has been unable to provide a safe home environment for her children. When asked to expound on that, Escamilla explained that Evelyn recently moved into a three-bedroom home with her mother. Escamilla described the home as appearing cluttered and smelling like animal urine. Evelyn's teenage daughter and brother also lived in the home. Escamilla also stated that there had been concerns because some of the people Evelyn resided with would not provide their information so that the Department could perform background checks, which was required by her service plan. Escamilla also expressed concerns regarding Evelyn's ability to parent because Evelyn commented that she did not believe her children needed to be on psychotropic medication to treat their attention deficit hyperactivity disorder (ADHD). Escamilla testified that Evelyn enrolled the children in "mainstream classes" rather than the special education classes that the children required due to their delays.

Escamilla described Evelyn's visitation as "sporadic . . . due to the amount of placements that the [children] have had, the locations . . . and also . . . the availability of [Evelyn] to participate in visitation." However, Evelyn's visits were not scheduled; instead, Evelyn worked with the children's foster families to set up visits.[3] Escamilla did confirm that Evelyn's visits were supervised and that "[t]he foster parents have stated that [Evelyn] is appropriate, that [she] brings them shoes, clothes, toys, things like that . . . ." Escamilla summarized the Department's belief that it was in the children's best interests to terminate the parent-child relationship:

---

[3] The children were in separate foster placements in different cities.

The Department feels it is in the children's best interest to terminate [Evelyn]'s rights to both children due to her ability to not be able to provide a safe and stable home environment for them, her inability to recognize their medical needs and educational needs and not being able to ensure that those needs are being met for both [children]. Her inability to provide mental—her ability to not provide [sic] the mental care that the children need as well. The physical disciplining is also an issue[,] and the Department does not feel like she is able to adequately care for her children.

According to Escamilla, the children changed foster homes several times throughout the case, sometimes due to the children's behavior. As to the children's desires, Escamilla confirmed that both children wanted to return to their mother but equivocated by stating that the children's desires vary. Despite previously testifying that Evelyn had not complied with her family plan of service and visited sporadically, Escamilla agreed during cross examination that Evelyn had completed all the services requested of her, remained drug-free, coordinated and attended her own visits, was gainfully employed, and remained in the same residence for at least nine months, and potentially longer.

Evelyn testified that she completed all the services requested of her. When asked what she learned from her parenting course, Evelyn explained she learned how to discipline her children, "how to tell them it[ i]s okay to say no[,] and let them cry if they have to cry." Evelyn elaborated that to discipline her children, she would put them in time out or take away their electronics. Although Evelyn confirmed she did not believe the children needed to be on psychotropic medication, she stated that she administered their prescribed medications during the return and monitor period.

According to Evelyn, the home she was living in was a four-bedroom home and the children would have their own room if they were returned to her. Evelyn further

4

testified that she applied for government supported housing and believes that she would qualify if the children were returned to her. Evelyn also testified that she would enroll the children in special education classes and continue their medications if they continue to be prescribed. Evelyn denied hitting Matthew or Xander.

At the conclusion of trial, the trial court entered an order terminating the parent-child relationship between Evelyn and both children pursuant to predicate grounds (D) (placing the children in dangerous conditions or surroundings), (E) (engaging in endangering conduct), and (O) (failing to complete the family plan of service). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O). The trial court further found that termination was in the children's best interest. *See id.* § 161.001(b)(2).

The trial court issued findings of fact and conclusions of law. *See* TEX. R. CIV. P. 296. The trial court found that Evelyn failed to comply with the following provisions of her service plan: (1) cooperate with the Department; (2) demonstrate appropriate parenting skills attained during the parenting classes and utilize them to effectively parent the children; (3) maintain contact with her children by participating in visitations; (4) comply with visitation rules specified by the Department; and (5) provide a home that is free of domestic violence, clean, safe, and drug free for the children. The trial court's conclusions of law stated that clear and convincing evidence supported grounds for termination under Subsections (O) (failure to complete service plan) and (N) (constructive abandonment) only. This appeal followed.

5

## II. STANDARD OF REVIEW AND APPLICABLE LAW

### A. Standard of Review

"[I]nvoluntary termination of parental rights involves fundamental constitutional rights" and divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (quoting *In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980)); *In re L.J.N.*, 329 S.W.3d 667, 671 (Tex. App.—Corpus Christi–Edinburg 2010, no pet.); *see In re K.M.L.*, 443 S.W.3d 101, 121 (Tex. 2014) (Lehrmann, J., concurring) ("Termination of parental rights, the total and irrevocable dissolution of the parent-child relationship, constitutes the 'death penalty' of civil cases."). Accordingly, termination proceedings must be strictly scrutinized. *In re K.M.L.*, 443 S.W.3d at 112.

A trial court may order termination of the parent-child relationship only if it finds by clear and convincing evidence that (1) the parent committed an act or omission described by Texas Family Code § 161.001(b)(1)(A)–(U) (predicate grounds), and (2) termination is in the child's best interests. TEX. FAM. CODE ANN. § 161.001(b)(1), (2). The "clear and convincing" standard falls between the preponderance of the evidence standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d at 847; *In re L.J.N.*, 329 S.W.3d at 671. It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007. The heightened burden of proof compels more stringent appellate review for termination suits compared to decisions regarding conservatorship. *In re J.A.J.*, 243

S.W.3d 611, 616 (Tex. 2007).

Evidence is legally sufficient to support termination if a reasonable factfinder could form a firm belief or conviction that the finding was true. *In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018). In conducting a legal sufficiency review, we assume that the factfinder resolved disputed facts in favor of its finding if it was reasonable to do so, and we disregard all evidence that a reasonable factfinder could have disbelieved or found to be incredible. *In re L.J.N.*, 329 S.W.3d at 671. We must also consider undisputed evidence, if any, that does not support the finding. *In re K.M.L.*, 443 S.W.3d at 113; *see In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002) ("Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.").

Evidence is factually insufficient to support termination "if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *In re A.C.*, 560 S.W.3d at 631 (citing *In re J.F.C.*, 96 S.W.3d at 266). Under the factual sufficiency standard, we defer to the factfinder's determinations on the credibility of the witnesses "so long as those determinations are not themselves unreasonable." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam) (quoting *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004)); *see also In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("A standard that focuses on whether a reasonable jury could form a firm conviction or belief retains the deference an appellate court must have for the factfinder's role.").

"In a bench trial, the trial court acts as the fact[]finder and is the sole judge of

witness credibility." *In re A.M.*, 418 S.W.3d 830, 841 (Tex. App.—Dallas 2013, no pet.) (citing *Nguyen v. Nguyen*, 355 S.W.3d 82, 88 (Tex. App.—Houston [1st Dist.] 2011, pet. denied)). "The fact[]finder may choose to believe one witness over another, and we may not impose our own opinion to the contrary." *Id.* (citing *Nguyen*, 355 S.W.3d at 88).

"In any case tried in the district or county court without a jury, any party may request the court to state in writing its findings of fact and conclusions of law." TEX. R. CIV. P. 296. A trial court's findings of fact in a case tried to the bench carry the same force and dignity as a jury's verdict upon jury questions but are only binding when supported by the evidence. *Fulgham v. Fischer*, 349 S.W.3d 153, 157 (Tex. App.—Dallas 2011, no pet.). A trial court's findings of fact are reviewable for factual and legal sufficiency while its conclusions of law are reviewed de novo. *Id.*

A "judgment may not be supported upon appeal by a presumed finding upon any ground of recovery or defense, no element of which has been included in the findings of fact . . . ." TEX. R. CIV. P. 299. "If a ground of recovery or defense is entirely omitted, the omission is deemed to be deliberate on the grounds that the trial court did not award relief as to that cause of action." *Clinton v. Gallup*, 621 S.W.3d 848, 850 (Tex. App.—Houston [14th Dist.] 2021, no pet.) (cleaned up).

## B.    Applicable Law

Among the predicate grounds for termination is that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child" or "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or

8

emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E). "[E]ndangerment encompasses 'more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment.'" *In re D.L.W.W.*, 617 S.W.3d 64, 78 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (quoting *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). "'[E]ndanger' means to expose to loss or injury; to jeopardize." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (quoting *Boyd*, 727 S.W.2d at 533).

Under Subsection (D), "we must examine the time before the children's removal to determine whether the environment itself posed a danger to the [children's] physical or emotional well-being." *In re L.W.*, 609 S.W.3d 189, 199–200 (Tex. App.—Texarkana 2020, no pet.) (quoting *In re L.C.*, 145 S.W.3d 790, 795 (Tex. App.—Texarkana 2004, no pet.)). The children's physical health or emotional well-being is endangered when the parent fails to remove them from a home in which abusive or violent conduct is occurring. *Id.* Unsanitary living conditions may also endanger the children's physical or emotional well-being by posing a health risk to the children. *In re S.B.*, 597 S.W.3d 571, 584 (Tex. App.—Amarillo 2020, pet. denied). "Inappropriate, abusive, or unlawful conduct by a parent or other persons who live in the child's home can create an environment that endangers the physical and emotional well-being of a child as required for termination under [S]ubsection D." *In re P.N.T.*, 580 S.W.3d 331, 355 (Tex. App.—Houston [14th Dist.] 2019, pet. denied).

Subsection (E) focuses on the parent's conduct rather than the child's conditions; it generally requires more than a single act or omission, but rather a "voluntary, deliberate,

9

and conscious course of conduct by the parent." *In re A.L.H.*, 624 S.W.3d at 56 (citing *In re K.A.C.*, 594 S.W.3d 364, 372 (Tex. App.—El Paso 2019, no pet.)). "A parent's abuse of a child endangers that child but also endangers other children the parent may have in his care." *In re P.N.T.*, 580 S.W.3d at 356 (citing *In re E.C.R.*, 402 S.W.3d 239, 248 (Tex. 2013)). "A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being." *Id.*

The primary difference between Subsection (D) and Subsection (E) is that Subsection (D) focuses on the child's conditions or surroundings while Subsection (E) focuses on the parent's or another's conduct, whether by overt act or omission. *In re A.L.H.*, 624 S.W.3d 47, 55–56 (Tex. App.—El Paso 2021, no pet.). However, the same evidence may support a finding under either subsection, depending on the circumstances. *Id.* (providing the example of continued domestic violence in the home with the children as grounds under both Subsection (D) and (E)).

The parent-child relationship is also subject to termination if a parent "fail[s] to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department . . . for not less than nine months." TEX. FAM. CODE ANN. § 161.001(b)(1)(O). "To terminate a parent's rights under Subsection (O), the court's order describing the actions necessary to obtain the return of the child must be 'sufficiently specific to warrant termination of parental rights for failure to comply with it.'" *In re A.L.R.*, 646 S.W.3d 833, 835 (Tex. 2022) (quoting *In re N.G.*, 577 S.W.3d 230, 238 (Tex. 2019)); *see* TEX. FAM. CODE ANN. § 263.102(a)(1) (requiring a

service plan to "be specific").

"The best-interest prong of the termination inquiry 'is child-centered and focuses on the child's well-being, safety, and development.'" *In re J.W.*, 645 S.W.3d 726, 746 (Tex. 2022) (quoting *In re A.C.*, 560 S.W.3d at 631). The Texas Supreme Court has identified several nonexclusive factors for courts to consider in determining the child's best interest, known as the *Holley* factors. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors include: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) the present and future emotional and physical danger to the child; (4) the parenting abilities of the individuals seeking custody; (5) the programs available to assist those individuals to promote the child's best interest; (6) the plans for the child by those individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate the existing parent-child relationship is an improper one; and (9) any excuse for the parent's acts or omissions. *Id.* The legislature has identified additional factors to consider when determining "whether the child's parents are willing and able to provide the child with a safe environment." TEX. FAM. CODE ANN. § 263.307(b). Evidence that is probative of grounds for termination may be probative of the best interest of the child, as well. *In re C.H.*, 89 S.W.3d at 28.

### III.   ANALYSIS

### A.   Best Interest

Because Evelyn's second issue is dispositive, we address it first. The testimony for this termination trial spanned only approximately fifty-eight pages of the reporter's

record, contained only one exhibit which was unrelated to Evelyn, and included testimony from only two witnesses to support termination for both parents. Evelyn argues that the *Holley* factors support maintaining the parent-child relationship between her and the children. The Department, on the other hand, argues the factors support termination. Bearing in mind the elevated burden of proof, presumptions in favor of maintaining the parent-child relationship, and deferral to the trial court's factual determinations, we apply the *Holley* factors to the evidence presented at trial to determine whether the evidence was legally and factually sufficient.

With respect to the first fact, the children's desires, Escamilla testified at trial that although the children's expressed desires vary, they most recently expressed the desire to return to their mother. The Department urges this Court to conclude that because there is some evidence that the children exhibited behavioral issues and cognitive delays, the children's desires "could be considered from the perspective of a younger child." Coupled with the children's changing desires and previous desire to stay with their foster families, the Department argues that the trial court could have concluded that the children actually desired to stay with their foster families. However, the evidence that the children desired to return to their mother at the time of trial is uncontroverted. *See In re K.M.L.*, 443 S.W.3d at 113; *In re J.F.C.*, 96 S.W.3d at 266; *see also* TEX. FAM. CODE ANN. § 162.010(c) (requiring a child twelve years of age or older to consent to their adoption unless waived by a court). Further, while there is some testimony that the children were "extremely delayed," there is no evidence that their delays resulted in them being unable to understand the proceedings, possible outcomes, or the impact of their expressed

12

wishes.[4] Accordingly, we conclude this factor weighs against termination.

The next factor considers the children's present and future emotional and physical needs. Evidence that the children have increased emotional and psychiatric needs is not disputed. Escamilla testified that Evelyn failed to enroll the children in special education classes during the return and monitor period.[5] Escamilla further expressed concern because Evelyn "made comments that she feels her children do not need to be on medication." However, Evelyn provided uncontroverted testimony that when the children were returned to her, "[t]hey always took the medication." *See In re K.M.L.*, 443 S.W.3d at 113; *In re J.F.C.*, 96 S.W.3d at 266. The Department argues that Evelyn's "lackadaisical attitude and inability to recognize that the children are 'extremely delayed,' have ADHD diagnoses, behavioral issues, and cognitive delays is indicative of her capability to meet the children's needs." We do not believe that Evelyn's doubt regarding the children's need for ADHD medication and failure to enroll the children in special education classes during the 2019 return and monitor period suffice to show that Evelyn exhibited a "lackadaisical attitude" towards the children's needs or otherwise failed to recognize their delays. The Department otherwise presented no other evidence that Evelyn could not meet the children's emotional or psychiatric needs. And there is no evidence the children had any special physical needs that required special care or attention that Evelyn could not

---

[4] Escamilla testified that, although Matthew was in the sixth grade, he struggled to read and write. Escamilla testified that Xander was "the same way." However, neither Escamilla nor Evelyn testified that the children did not understand the proceeding or its consequences.

[5] Escamilla testified, "[F]rom my understanding[,] when they were placed with her, when she enrolled them in school, she enrolled them in regular mainstream classes and even though she was aware they needed to be enrolled in special education classes." Escamilla was not the caseworker during the return and monitor period.

13

provide. Accordingly, this factor only slightly supports termination, if at all.

The Department argues that the evidence that Evelyn abused Matthew demonstrates an increased risk of emotional or physical danger to the children. The evidence presented at trial shows that Matthew twice outcried that his mother hit him, and that he had bruises from each incident. The testimony, however, provides no indication as to the location, size, severity, or age of the bruises. Further, there is no information as to the context of Evelyn's alleged hitting of Matthew. *See* TEX. FAM. CODE ANN. § 151.001(e)(1) (providing a parent the right to "use corporal punishment for the reasonable discipline of a child").

Indeed, further testimony and questioning by the Department related to Evelyn's method of disciplining the children. Notably, the trial court's findings of fact and conclusions of law contain no finding that Evelyn abused the children or engaged in any conduct which endangered their physical health or emotional well-being.[6] Further, the trial court excluded the conclusion that the evidence supported termination under Subsections (D) and (E). *See* TEX. R. CIV. P. 299. While a parent's use of corporal punishment may rise to the level of abuse that endangers a child's physical or emotional well-being, evidence that a parent disciplined their child and that the child had bruises without more context is not factually sufficient to establish abuse. *Compare In re J.C.*, 151 S.W.3d 284, 288 (Tex. App.—Texarkana 2004, no pet.) (considering evidence that father punched his three-year-old child in the stomach, broke the child's hand, and beat the child

---

[6] The trial court could have believed Evelyn's testimony that she never hit Matthew or Xander. *See In re A.M.*, 418 S.W.3d 830, 841 (Tex. App.—Dallas 2013, no pet.) ("The fact[]finder may choose to believe one witness over another, and we may not impose our own opinion to the contrary.").

with a belt, leaving bruises "from [the child's] head to his toes"), *and In re G.P.*, No. 01-16-00346-CV, 2016 WL 6216192, at *11 (Tex. App.—Houston [1st Dist.] Oct. 25, 2016, no pet.) (mem. op.) (considering evidence that father hit or slapped his child "multiple times" on the face and head, enough to leave multiple bumps including a knot the size of half a boiled egg), *with In re Wean*, No. 03-10-00383-CV, 2010 WL 3431708, at *7 (Tex. App.—Austin Aug. 31, 2010, no pet.) (mem. op.) (concluding mother's testimony that father disciplined children by spanking them did not constitute an act of family violence under Texas Family Code § 71.004(1)). Accordingly, this factor does not support termination.

The Department similarly argues that the alleged physical abuse, Evelyn's denial that the children need psychotropic medications, denial that the children needed special education classes before their removal, and failure to enroll the children in special needs classes demonstrate that Evelyn lacks parenting skills. The Department further contends that Evelyn failed to demonstrate changed behaviors and improved parenting skills during her return and monitor, which shows questionable willingness to access programs and follow through with services. The Department points to Evelyn's testimony that the children did not have any learning disabilities or behavioral problems prior to their removal over four years ago as evidence that she lacks parenting skills. However, Evelyn's testimony in this regard was uncontroverted. *See In re K.M.L.*, 443 S.W.3d at 113; *In re J.F.C.*, 96 S.W.3d at 266. The Department did not present any evidence that would allow a factfinder to conclude that the children had exceptional needs prior to the Department's involvement. As noted, although Evelyn expressed doubt as to the children's need for

15

psychotropic medication, the uncontroverted evidence is that when the children were returned to her care, they were provided their medication. *See In re K.M.L.*, 443 S.W.3d at 113; *In re J.F.C.*, 96 S.W.3d at 266. Additionally, we reiterate that the trial court's findings of fact and conclusions of law excluded any findings that Evelyn physically abused her children. *See* TEX. R. CIV. P. 299.

The Department also points to testimony that Evelyn's visitation with the children was "sporadic" as evidence that she lacks the necessary parenting skills. However, Escamilla explained that visits were not scheduled but rather occurred "whenever [Evelyn] and the foster parents c[ould] agree on a day and a time" because the children were each placed in separate foster homes in different cities than Evelyn. It is difficult to determine what degree of fault for the "sporadic" visitation lies with Evelyn. Further, when Evelyn was unavailable for visitations, there was no testimony elicited as to the reason for her unavailability—such as due to her work schedule. Escamilla provided no explanation of what "sporadic" visitation entailed: weekly, bi-weekly, monthly, or any other length of time between visits.[7] *See In re M.A.J.*, 612 S.W.3d 398, 412 (Tex. App.—Houston [1st Dist.] 2020, pet. denied) ("[C]onclusory opinion testimony, even if uncontradicted, does not amount to more than a scintilla of evidence; it is no evidence at all."); *see also City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009) ("[I]f no basis for the opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory

---

[7] Escamilla testified: "[The children] had a phone call with [Evelyn] on Mother's Day and I think she saw both [children] one time for the month of May. Then prior to that, I do[ not] know if she saw them prior to that or not." Trial occurred on May 25, 2022. Despite this limited testimony, the trial court found that "[Evelyn] has had sporadic visitation and phone conversations with the children since the failed [r]eturn and [m]onitor in August 2019."

16

statement and cannot be considered probative evidence . . . ."). Escamilla testified that the foster parents "have reported no concerns" and stated that Evelyn "brings [the children] shoes, clothes, toys, [and] things like that when she visits," albeit only to more recent visits. Accordingly, the evidence regarding Evelyn's parenting abilities does not support termination.

A child's need for permanence through the establishment of a "stable, permanent home" has been recognized as the paramount consideration in determining best interest. *In re G.A.C.*, 499 S.W.3d 138, 141 (Tex. App.—Amarillo 2016, pet. denied); *In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.); *see In re R.S.-T.*, 522 S.W.3d 92, 113 (Tex. App.—San Antonio 2017, no pet.). The Department's plan for the children is to seek unrelated adoption. The Department is not required to identify an adoptive family for this factor to support termination; instead, we review the entire record to determine whether "a factfinder could reasonably form a firm conviction or belief that termination of the parent's rights would be in the child's best interest—even if the [Department] is unable to identify with precision the child's future home environment." *In re C.H.*, 89 S.W.3d at 28. The evidence relevant to the Department's plan to seek unrelated adoption for the children shows that the children's current foster families are not interested in adopting them. Further, the children have had several placement changes attributed to their behavior, including one instance in which a relative requested that the children be removed because Matthew claimed he was not being fed enough.[8]

---

[8] Escamilla testified that she did not believe Matthew was telling the truth about not being fed enough because he gained ten pounds in the three months that he was in the Department's care.

17

Indeed, Escamilla agreed that the children are difficult to place. Thus, the likelihood that the children would be adopted appears to be reduced. Escamilla also testified that although the children's foster families are not willing to adopt the children, they are willing to continue as long-term placements. The parent-child relationship does not need to be terminated in order for the children to remain in their placements. *See In re F.M.E.A.F.*, 572 S.W.3d 716, 732 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) ("[T]here is no evidence that termination would further the need for permanence through the establishment of a stable, permanent home."). Conversely, Evelyn testified that the home she shares with her mother and teenage daughter has an extra bedroom for the children.[9] In light of the entire record, we conclude this factor does not support termination.

As it relates to the stability of the home or proposed placement, Escamilla testified that "[Evelyn] has moved around a lot during this case." At times, Escamilla was not able to visit Evelyn's home or would visit only to discover Evelyn was not living where she claimed to be. Escamilla expressed concern that Evelyn showed an "inability to remain in one home longer than a few months, six months." However, the trial court found that Evelyn resided in her current home for approximately fourteen months. Escamilla described Evelyn's home as a three-bedroom home that was cluttered and smelled like animal urine. *See, e.g.*, *In re S.B.*, 597 S.W.3d 571, 576–84 (Tex. App.—Amarillo 2020, pet. denied) (concluding evidence that parents failed to remedy unclean home that had a kitchen that "was not sanitary for cooking or eating," and other parts of the home had

---

[9] Evelyn did not file a petition to modify the parent-child relationship or otherwise formally request the children be returned to her.

18

"cockroaches crawling on the walls," cookware with old food caked on it, was cluttered with trash, and emitted a "strong odor" supported termination). Finally, the trial court found that Evelyn failed to "[p]rovide a home that is free of domestic violence, clean, safe[,] and drug free for the children." However, there is no testimony supporting a finding that the home—or any home that Evelyn lived in—had any domestic violence or drug possession or use. *See Fulgham*, 349 S.W.3d at 157. Further, testimony that a home is "cluttered" and smells like animal urine alone is not a significant reason to terminate parental rights. The trial court additionally found that Evelyn had maintained her employment for approximately a year and a half, which demonstrates some stability. This factor ultimately only slightly supports termination, if at all.

Finally, we consider the last two factors together: the parent's acts or omissions that may indicate the existing parent-child relationship is an improper one; and any excuse for the parent's acts or omissions. Again, we note that the trial court excluded any finding that Evelyn endangered the physical health or emotional well-being of the children or that she hit either child. Rather, the trial court's findings of facts and conclusions of law relate exclusively to Evelyn's failure to comply with her service plan. The trial court specifically found that Evelyn failed to complete the following tasks on her family plan of service:

  a.   Cooperate with the Department[;]

  b.   Demonstrate appropriate parenting skills attained during the parenting classes and utilize them to effectively parent the children[;]

  c.   Maintain contact with her children by participating in visitations[;]

  d.   Complied with visitations rules specified by [the] [Department] caseworker[;] [and]

19

e.      Provide a home that is free of domestic violence, clean, safe[,] and drug free for the children.

The evidence does not support the trial court's finding that Evelyn failed to maintain contact with her children by failing to participate in visits. Although Escamilla testified that Evelyn's visits were sporadic, her specific testimony only related to Evelyn's visits during the month of trial, and she was otherwise unaware of Evelyn's visits. *See In re M.A.J.*, 612 S.W.3d at 412. Likewise, there is no evidence that Evelyn failed to follow the visitation rules established by the Department.[10] As previously noted, there is no evidence that Evelyn's home had any history of domestic violence or drug possession or use. Further, although the trial court found that Evelyn failed to demonstrate appropriate parenting skills attained through her family plan of service, the evidence presented demonstrates the opposite—Escamilla testified that Evelyn's behavior was appropriate during the visits and there were no concerns. Additionally, there is no evidence detailing when Evelyn completed the required parenting classes, so there was no basis for the trial court to determine whether any shortcomings occurred before or after she had an opportunity to learn from the classes.

However, Escamilla's testimony that Evelyn failed to provide necessary information for people residing with her was a direct violation of her family plan of service and demonstrates that she failed to cooperate with the Department. Although Evelyn explained that the person that she was living with refused to provide the information, it is

---

[10] The Department points to Escamilla answering affirmatively that there were "conversations between [Evelyn] and the children resulted in some emotional meltdown." However, after Escamilla agreed to the question, Evelyn objected to Escamilla's subsequent testimony as hearsay, which was sustained by the trial court. Beyond that, there is no information reflecting that Evelyn violated any of the Department's visitation rules. Indeed, Escamilla testified that the foster parents reported the visits to be appropriate.

still a violation. *See In re J.M.T.*, 519 S.W.3d 258, 267 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (noting that partial compliance with the service plan is insufficient to avoid termination). Further, Escamilla testified that Evelyn was not always honest about where she was residing, but her family plan of service required her to notify the Department of her residence within three days of moving and allow the Department to visit the home. Evelyn did not offer any explanation for this behavior. While a parent's failure to comply with the service plan surely impacts whether termination is in the child's best interest, the degree of participation and the specific infractions is also considered. *See id.* at 269 ("[I]n conducting the best-interest analysis, a court may consider not only direct evidence but also may consider circumstantial evidence, subjective factors, and the totality of the evidence."). This factor only slightly supports termination.

Having reviewed the entire record, including the trial court's findings of fact and conclusions of law, we conclude that a reasonable factfinder could not have formed a firm belief or conviction that termination was in the children's best interest. *See In re A.C.*, 560 S.W.3d at 631. Therefore, the evidence was legally insufficient to support a finding that termination was in the children's best interest. Evelyn's second issue is sustained.

## B. Predicate Grounds

Although we are reversing the trial court's order terminating the parent-child relationship on the basis that the Department failed to prove that termination is in the children's best interest, we conclude that due process requires us to also review the grounds found by the trial court. *See* TEX. FAM. CODE ANN. § 161.004(b) (allowing a trial court to consider evidence presented at a previous hearing for termination); *In re N.G.*,

21

577 S.W.3d at 235 ("[D]ue process . . . requires a heightened standard of review of a trial court's finding under [§] 161.001(b)(1)(D) or (E), even when another ground is sufficient for termination . . . ."). Here, if we did not address Evelyn's argument that the evidence was insufficient to support a finding under predicate grounds (D) and (E), the trial court could consider its findings in a future termination trial. *See* TEX. FAM. CODE ANN. § 161.004(b).

Beyond Escamilla's testimony relating to Matthew's outcry, the Department did not present any evidence to support a finding under predicate grounds (D) and (E). Regarding Matthew's outcry, we note the significance of the trial court's exclusion from its findings of fact and conclusions of law that Evelyn struck Matthew or otherwise endangered either child's physical health or emotional well-being. *See* TEX. R. CIV. P. 299; *Clinton*, 621 S.W.3d at 850. Accordingly, we conclude there is both legally and factually insufficient evidence to support termination under predicate grounds (D) and (E).

However, as discussed, Escamilla's testimony that Evelyn failed to provide the necessary information of the person she resided with, and that Evelyn provided false information regarding her own residence is uncontroverted. *See In re A.C.*, 560 S.W.3d at 630–31. The trial court specifically found that Evelyn failed to comply with her family plan of service. Although Escamilla acknowledged that Evelyn completed all her services, partial compliance with a service plan does not prevent termination under Subsection (O).[11] *See In re J.M.T.*, 519 S.W.3d at 267. After reviewing the entire record, we conclude

---

[11] *In re N.G.* does not require us to review termination under predicate ground (O); however, we do so out of an abundance of caution.

there is both legally and factually sufficient evidence that Evelyn failed to comply with her court-ordered family plan of service. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(O). Evelyn's first issue is sustained as to predicate ground (D) and (E) and overruled as to ground (O).

## IV. CONCLUSION

We reverse the trial court's judgment terminating the parent-child relationship between Evelyn and her children. We remand this case with instructions for the trial court to deny the Department's petition for termination and for further proceedings consistent with the Texas Family Code regarding child protection proceedings. *See id.* § 263.5031(a)(4)(K).

CLARISSA SILVA
Justice

Delivered and filed on the
22nd day of December, 2022.